ORIGINAL

FILED IN ... OFFICE

SEP 0 8 2005

LUTHER ... CHIAS, Clerk
By: _____ Deputy Clerk

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

GOSHAWK DEDICATED LTD., as )
the sole Member of Syndicate 102 at )
Lloyd's for the 2000 Underwriting Year )
of Account, and as a Member of )
Syndicate 2021 at Lloyd's for the 1999 )
Year of Account )
                                 )
KITE DEDICATED LTD , f/k/a )
Goshawk Dedicated (No. 2) Ltd., as the )
sole Member of Syndicate 102 at )
Lloyd's for the 2001-2003 Underwriting )
Years of Account, and )
                                 )
           Plaintiffs, )
                                 )
     vs. )
                                 )
AMERICAN VIATICAL SERVICES, )
LLC, a Georgia Corporation )
                                 )
          Defendant. )

CASE NO. 1:05-CV-2343

**COMPLAINT FOR:**

1. **FRAUD**
2. **NEGLIGENCE**

*RWS*

## JURISDICTION AND VENUE

     1.     **Jurisdiction.** This Court has jurisdiction over this action pursuant to 28 U S.C. § 1332 because Plaintiffs are of diverse citizenship from Defendant American Viatical Services, LLC, ("AVS") and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

FORMS RECEIVED
Copy ... _____
Pretrial ... _____
Time V... _____

2.   **Venue.**  Venue is proper in this Court pursuant to 28 U.S.C §

1391(a) because AVS is a Georgia limited liability corporation which has its

principal place of business in Kennesaw, Georgia and a substantial part of the

events or omissions giving rise to the claims occurred within this district.

## PARTIES

3.   **Plaintiff Goshawk Dedicated Ltd.**  Plaintiff Goshawk Dedicated

Ltd. ("Goshawk Dedicated") is a limited liability corporation formed under the

laws of England, with its principal place of business in London, and is domiciled

in the United Kingdom.  Goshawk Dedicated was the sole member of Lloyd's

Syndicate 102 ("Syndicate 102") for the 2000 year of account and provided

78.62% of the capital of Lloyd's Syndicate 2021 ("Syndicate 2021") for the 1999

year of account.  Syndicate 102 and Syndicate 2021 underwrote certain

contingent cost insurance policies ("CCI") in connection with certain life

insurance policies purchased by their assureds in the secondary life insurance

market.  The underwriting of the CCI business by Syndicates 102 and 2021 was

undertaken by Goshawk Syndicate Management Ltd. ("GSML"), as the

Syndicate's managing agent either directly or through its underwriting agent

Merlin Underwriting Agency Ltd. ("MUAL"), both acting on behalf of

Syndicates 102 and 2021  Hereinafter, GSML and MUAL are sometimes collectively referred to as the "Goshawk Underwriters."

**4.    Plaintiff Kite Dedicated Ltd.**  Plaintiff Kite Dedicated Ltd. ("Kite Dedicated"), formerly known as Goshawk Dedicated (No 2) Ltd., is a limited liability corporation formed under the laws of England, with its principal place of business in London, and is domiciled in the United Kingdom.  Goshawk Dedicated (No 2) Ltd. was the sole member of Syndicate 102 for the 2001-2003 years of account

**5.    Defendant AVS and AVT.**  Plaintiffs are informed and believe and based thereon allege that at all relevant times, AVS was a limited liability corporation existing under and by virtue of the laws of the State of Georgia with its principal place of business now in Kennesaw, Georgia.  Based upon an inquiry reasonable under the circumstances and with the belief that evidentiary support will likely be found after a reasonable opportunity for further investigation or discovery, Plaintiffs are informed and believe and based thereon allege that no shareholder of AVS is a citizen of a foreign country.  Plaintiffs are informed and believe and based thereon allege that at all relevant times American Viatical Testing, LLC ("AVT") was and is a wholly-owned subsidiary of AVS or is

-3-

otherwise so closely affiliated with AVS as to be the alter ego of AVS.  AVS and

AVT are referred to herein as simply "AVS."  As described hereinafter, AVS

provided to the CCI assureds putative life expectancy evaluations in connection

with issuance of CCI policies by Syndicates 102 and 2021 (the "Syndicates").  To

become an approved life evaluator in connection with insurance to be

underwritten and issued by the Syndicates, AVS made numerous representations

about its adherence to professional standards and its ability to achieve certain

levels of accuracy with its life expectancy evaluations.  As set forth within, at all

pertinent times, AVS was specifically aware that the life expectancies it provided

to assureds would be transmitted by the assureds to the Syndicates, and that the

life expectancies so provided and transmitted would be determinative of whether

and when insured losses occurred under the CCI policies.  Further, as set forth

within, at all pertinent times, AVS was specifically aware that the Syndicates

would rely, in structuring, underwriting, and issuing the CCI policies, on the

representations of AVS that it would employ the appropriate analyses and

procedures in developing life expectancies, and that it would use a methodology

that would yield an 85% confidence level.

## PRELIMINARY ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

6. **Nature of This Suit.** This is an action to recover the damages that Syndicates 102 and 2021, and therefore Plaintiffs, have suffered and will suffer as a result of the fraud and negligence of AVS in providing false and misleading life expectancy evaluations. Plaintiffs have already paid out over $13.8 million in claims under CCI policies that they would not have issued but for reliance upon the representations and conduct of AVS. The total amount of damages is currently unknown but not less than $13 8 million, and Plaintiffs will therefore seek damages according to proof at time of trial

7. **The Secondary Life Insurance Market.** Changing circumstances for life insurance policyholders and other factors have combined to create a secondary market for life insurance where one sells his or her life insurance policy to another person. This secondary market for life insurance policies primarily involves two categories of policyholders: those who are terminally ill and those who are of advanced age   A sale of a life insurance policy by one who is terminally ill is called a "viatical settlement", a sale by one of advanced age is

called a "life settlement."  This action arises out of both viatical settlements and

life settlements

     **8.**    **Viatical and Life Settlements.**  A viatical settlement is a financial

option for a terminally ill life insurance policyholder (a "viator") who wants to

sell his or her life insurance policy and wishes to assign the policy proceeds,

payable upon death of the viator, to a third party (a "settlement provider") in

exchange for immediate payment.  The amount of the payment to the viator

exceeds the policy's surrender value but is less than the total policy benefit

Thus, the viator is able to obtain cash during his or her lifetime, and the

settlement provider (who must keep the policy in force during the viator's

lifetime by paying premiums) can, upon death of the viator, recover more than its

payment to the viator   The settlement provider will make a profit if the amount it

receives when the viator dies is greater than the sum of the amount paid to the

viator, the interim premium payments made up to the point of death, the

settlement procedure costs (including the cost of life expectancy evaluations),

various other out of pocket costs, and the cost of capital committed to the

foregoing costs in the period between purchase of the life policies and the

payment of the death benefit.  Life settlements generally operate under the same

principles and procedures; the distinguishing difference between the two is that in

viatical settlements a terminal illness is involved, whereas a life settlement involves one who is of advanced age  Hereinafter, persons who are the insureds on life policies sold into the secondary market, whether by a viatical settlement or a life settlement, are referred to as the "life insureds."

**9.    Impact of Life Expectancy Evaluation.** Two primary factors heavily influence the amount of a viatical or life settlement:  the amount of the policy proceeds at issue and the life expectancy of the individual whose life is at issue.  The amount of the policy proceeds is already established before a viatical or life settlement takes place.  Settlement providers routinely obtain life expectancy evaluations in connection with viatical and life settlements.  The amount paid by the settlement provider to purchase the right to receive policy proceeds depends primarily upon the individual's life expectancy; the longer the individual is expected to live, the lower the payment will be.  The reason is readily apparent:  given the time value of money the settlement provider will generally pay less for a benefit it must wait longer to receive.  In addition, the settlement provider must pay premiums to keep the policy in force during the individual's lifetime, thereby reducing the settlement provider's profit from the transaction as time goes on.  If the individual significantly outlives his or her life expectancy, then the settlement provider can lose money in the transaction

because it will have paid more in settlement funds, policy premiums and other

costs than the amount of the policy's death benefit assigned to it.   Life

expectancy ("LE") evaluations are provided by companies such as AVS.

     **10.**   **Contingent Cost Insurance.**  CCI insures a settlement provider

against some of the risk that a life insured will significantly outlive his or her LE.

Generally, a claim under the CCI policies discussed herein is triggered when a

life insured lives more than two years beyond the LE (i.e., LE+2 years = trigger

date). Between January 15, 1999 and March 26, 2003, the Syndicates provided

CCI policies with an aggregate potential exposure of millions of dollars based

upon LE evaluations provided by AVS.

     **11.**   **Placement and Timing of Contingent Cost Insurance.**

Typically, a CCI policy issued by the Syndicates is put into place before

individual life policies are purchased by settlement providers   The CCI policy

generally provides coverage for multiple purchases during a specified period up

to a maximum aggregate limit of exposure for the insurers, the Syndicates.  The

CCI policy specifies certain conditions that must be met for any particular

purchase to be included within the scope of the protection provided by the CCI.

These conditions concern items such as, for example, the life insurance policy

amount, the issuer, the life expectancy and so on.  A life policy that meets the conditions is referred to as a "Qualified Life Insurance Policy" ("QLIP") and is eligible for coverage under a CCI policy.  A QLIP is brought within the coverage of an existing CCI policy by procedures that vary among the CCI policies, including by an  assured (a settlement provider who purchased the QLIP) "declaring" the QLIP to the CCI policy, along with payment of a premium that typically represents 4% to 5% of the death benefit of the QLIP.

**12.   How Contingent Cost Insurance Works.**  A typical situation consists of the following: a life insured wants to sell his life insurance policy to a settlement provider.  The settlement provider determines that the life insured's life expectancy is, for example, twenty months and based upon this, the settlement provider's other costs, the amount of policy proceeds and the demands of the life insured, the settlement provider agrees to pay an amount to the life insured, who then assigns the right to receive benefits to the settlement provider. The settlement provider, who is the assured under the CCI policy, then declares or otherwise brings the life policy into the CCI policy.  A claim arises under a CCI policy when a life insured lives more than two years beyond the established LE. The requirement that a life insured must live more than two years beyond the LE operates to limit the risk of the insurer and to enable this type of insurance to be

underwritten and issued. When a life insured does live more than two years beyond the LE, and subject to the terms of CCI policy at issue, the Syndicate, as the insurer on the affected CCI policy, pays to the settlement provider the net death benefit of the life insurance policy and the right to receive the life insurance policy proceeds is assigned onward to the Syndicate. To protect its right to someday receive the death benefit now assigned to it, the Syndicate must thereafter continue making premium payments to keep the policy in force until the actual time of death of the life insured.

13. **Input from AVS, AVT, and Settlement Providers.** Prior to underwriting any of the CCI policies, the Goshawk Underwriters met with representatives of settlement providers and AVS for the purpose of assessing the risks of writing CCI policies, an assessment the Goshawk Underwriters needed for setting the premiums for such policies. From the very beginning, the Goshawk Underwriters emphasized the critical importance of accurate LE evaluations in deciding whether to issue CCI.

14. **Phillip Loy and AVS.** On or about December 9, 1998, a representative of GSML met with Philip R. Loy ("Loy"), upon information and belief, the President of Defendant AVS, at AVS's offices in Roswell, Georgia.

Loy represented to GSML, and subsequently to MUAL, that AVS was a leading life evaluator with extensive experience in arriving at LE evaluations for both viatical and life settlements.  Loy represented to the Goshawk Underwriters that he personally had a background in biophysics and cancer and that he had founded AVS to provide LE evaluations for viatical settlements.  Loy represented that he provided LE evaluations to ten or twelve settlement providers.  Loy also told the Goshawk Underwriters that AVS had kept a copy of all of the files and LE evaluations that had been made, which included many thousands of files and that he was moving to new office space which would allow maintenance of 100,000 files.

15.    **Adherence to Professional Standards.**  Loy represented to Goshawk Underwriters at that time and thereafter on a continuing basis that AVS would adhere to professional standards to ensure that LE evaluations provided by AVS in connection with the issuance of CCI policies would be accurate.  Among other things, AVS would use actuarial tables that were current, sufficiently precise, fit for their intended purposes, and, where extended or modified, appropriately adjusted

16.   **AVS Methodology and 85% Confidence Level.**  In addition to
the foregoing representations, Loy represented to the Goshawk Underwriters prior
to, on and after December 9, 1998, that AVS employed a methodology for
calculating LEs that had been arrived at through a combination of using actuarial
charts and mortality tables from leading life insurers, mortality adjustment factors
and experience.  Further, Loy represented that AVS employed a methodology that
allowed AVS to reach an LE at an 85% confidence level.  According to Loy, the
"85% confidence level" meant that for a particular LE evaluation for a particular
life insured, 85% of those persons who were similarly situated in terms of age,
health and medical experience would die by the LE given for that life insured.

17.   **Reliance Upon AVS's Representations.**  Plaintiffs reasonably
relied on AVS's representations that it would adhere to professional standards and
that its methodology produced LE evaluations at an 85% confidence level.
Plaintiffs designated AVS as an approved evaluator that could be utilized by
settlement providers to provide the LEs that would become a material and integral
part of the CCI policies.  The Goshawk Underwriters also proceeded to structure
and underwrite CCI policies based upon the representation that AVS utilized a
methodology by which it established a life expectancy at the "85% confidence
level."  The Goshawk Underwriters would not have underwritten the CCI policies

issued by the Syndicates if they had known that the LE evaluations provided by AVS to the assureds did not adhere to professional standards and were not made using a methodology designed to achieve an 85% confidence level.

18.   **Ongoing Representations.**  From December 1998 and throughout the period that the Goshawk Underwriters were underwriting CCI policies to be issued by the Syndicates, AVS continued to make representations of adherence to professional standards and that its LE evaluation methodology met the 85% confidence level.  At a meeting with MUAL on April 20, 2000, Loy, acting for AVS, confirmed that AVS was utilizing a methodology that would meet the requirements of the Goshawk Underwriters   Subsequently, in or about April 2002, Loy on behalf of AVS represented to an agent of the Goshawk Underwriters, Claims Specialist International Ltd , that AVS was fully cognizant of the need for LE evaluations for the Goshawk Underwriters to meet an 85% confidence level, and that AVS was making LE evaluations to meet that requirement

19.   **Falsity of AVS's Representation.**  In fact, AVS did not adhere to professional standards and the methodology used by AVS did not arrive at a "85% confidence level," such that the representations by Loy and AVS in

December 1998 and thereafter were materially false. The methodology used by Defendant resulted in LE evaluations whereby at the estimated LE of a particular life insured, less than 50% of persons of the same age, with similar health and medical experience as the particular life insured, would be expected to have died. This discrepancy between the methodology to achieve an 85% confidence level represented by Loy and Defendant and the methodology actually used by Defendant was a material misrepresentation of fact that the Goshawk Underwriters relied on in underwriting the CCI policies issued by the Syndicates

20. **Failure of AVS to Perform as Promised**. In reality, Defendant did not employ the promised practices, methods, protocols or formulae, including those required to achieve the 85% confidence level, notwithstanding its representations to the contrary and its knowledge of the consequences of its actions in connection with CCI for these transactions. Defendant did not adhere to professional standards in providing the LEs to the CCI assureds. Knowing that the Goshawk Underwriters would rely upon the LE evaluations that Defendant was providing to the Goshawk assureds for the CCI policies, Defendant intentionally provided LE evaluations that it represented were prepared using correct mortality tables, operated to yield the 85% confidence level, but which, in fact, were not so prepared and therefore were false and misleading. At the time

-14-

that Defendant promised that it would so perform their LE evaluations, it had no

intention of ever doing so or even trying to meet the 85% confidence level by

using the necessary and appropriate assessment methods, practices, protocols

and/or formulae. At the same time Defendant did not, in fact, adhere to

professional standards. Defendant expected and intended that the Goshawk

Underwriters rely upon its representations about the methodology of their LE

evaluations in underwriting CCI policies, and the Syndicates were misled into

issuing CCI Policies. Based upon the LE evaluations of Defendant, the

Syndicates issued to settlement providers CCI policies with exposure in the

millions of dollars.

      **21.**   **Gross Inaccuracy of LE Evaluations.** Experience to date

demonstrates that, apart from AVS's failure to apply the methodology needed to

achieve an 85% confidence level, AVS failed to use plausible mortality rates in

the development of LEs. The LEs prepared by AVS are so consistently and

significantly outside that range as to be not only unsupportable, but completely

false. For example, under a CCI policy insuring a particular settlement provider,

Portsmouth Settlement Company, Defendant provided LEs for 163 life insureds

as of the CCI policy inception date, January 15, 1999. Under the LE evaluations

provided to Portsmouth by AVS, the average LE of the 163 life insureds was 1 9

years, with a maximum LE for an individual life insured of 5.0 years. In fact, the

LEs provided by Defendant were so inaccurate as to approach statistical

impossibility. As of April 1, 2005, more than six years after Defendant had

provided the LEs, 89 of the original 163 life insureds were still living  If the

Defendant's LEs, which averaged 1.9 years, were properly prepared, the

statistical probability that over half would still be living at the present time would

approache zero  An error of that gross magnitude strongly supports the

conclusion that the methodology employed by Defendant was either fraudulent,

reckless or grossly negligent and that Defendant had no intention of fulfilling its

promises.

     **22.**   **Resulting Damage to Plaintiffs**. The Goshawk Underwriters'

reliance upon the methodology used by Defendant in providing LE evaluations to

the assureds and the failure of Defendant to adhere to professional standards has

caused the Syndicates to suffer millions of dollars in damages in the form of

claims by assured settlement providers under the CCI policies. The Syndicates

have already paid out over $13.8 million in claims that it would not have had to

pay but for the conduct of Defendant. The LEs that Defendant provided to the

assureds were generally incorporated by the assureds into a monthly schedule,

generally referenced to in the CCI policies as a bordereaux, submitted for the CCI

-16-

policies. The Syndicates would have never issued those CCI policies had they known that the LE evaluations being provided by Defendant to the assureds, so critical to the accurate underwriting of the policies, were so unreliable.

## FIRST CLAIM FOR RELIEF

### (Fraud – Promise Made Without Intent to Perform)

23.    **Incorporation By Reference.**  Plaintiffs reallege paragraphs 1 through 22, inclusive, of this Complaint.

24.    **Promises.**  Defendant promised the Syndicates, among others, that it would at all times adhere to professional standards and, in addition, employ the necessary and appropriate methods, protocols, practices and/or formulae to meet the 85% confidence level in connection with the LEs they provided to the CCI assureds.

25.    **Absence of Intent.**  At the time Defendant made these promises, it had no intention of fulfilling them.

26.    **Knowledge of Intended Use.**  Defendant knew that the Syndicates would rely upon their promise in underwriting and issuing the CCI policies, and

Defendant intended that the Syndicates issue the CCI policies based upon its promises and the expectation that they would be honored.

27. **Reasonable Reliance by the Syndicates.** The Syndicates, through the Goshawk Underwriters, reasonably relied upon the promises of AVS to meet the 85% confidence level in the LE evaluations provided to the assureds and to adhere to professional standards when the Goshawk Underwriters were underwriting the CCI policies. Had the Goshawk Underwriters known that AVS had no intention of using the appropriate methods and practices to meet the 85% confidence level and of adhering to professional standards, they would not have relied upon the LE evaluations of Defendant provided to the assureds in underwriting the CCI policies and the Syndicates would not have issued them.

28. **Proximate Cause and Damages.** As a proximate cause of the false promises of Defendant, the Syndicates, and therefore Plaintiffs, have been damaged and will suffer greater damages in the future, specifically in the form of claims by their assureds under the CCI policies that Plaintiffs would not have issued had they known that Defendant had no intention of providing LE evaluations adhering to professional standards and that met the 85% confidence level. Plaintiffs have already paid out over $13.8 million dollars in claims under

CCI policies that they would not have issued but for reliance upon the false promises of Defendant

### SECOND CLAIM FOR RELIEF
### (Fraud – False Statement Without Knowledge of Truth or Falsity)

**29.**   **Incorporation By Reference.**  Plaintiffs reallege paragraphs 1 through 22, inclusive, of this Complaint.

**30.**   **False Statement.**  By its words and conduct, knowing the specific 85% confidence level requirement of the Goshawk Underwriters and the specific purpose for its LE evaluations, Defendant told the Goshawk Underwriters, among others, that the LE evaluations it provided to the assureds adhered to professional standards and met the 85% confidence level, which was false.

**31.**   **Absence of Knowledge of Truth or Falsity.**  At the time it made those false statements, Defendant did not know their truth or falsity.  That is, Defendant had no idea of whether the LE evaluations it provided to the assureds met the 85% confidence level or not.

**32.**   **Knowledge of Intended Use.**  Defendant knew that the Goshawk Underwriters would rely upon the statements in underwriting the CCI policies and

the Syndicates in issuing them, and Defendant intended that the Syndicates issue
the CCI policies based upon its statements.

**33.   Reasonable Reliance By the Goshawk Underwriters and the
Syndicate.**  The Goshawk Underwriters were unaware of the falsity of the
statements by Defendant.  The Goshawk Underwriters reasonably relied upon the
false statements of AVS when the Goshawk Underwriters were underwriting and
the Syndicates were issuing the CCI policies.  Had the Goshawk Underwriters
known that AVS, in reality, had no idea of whether its LE evaluations adhered to
professional standards or met the 85% confidence level, the Goshawk
Underwriters would not have relied upon the AVS LE evaluations provided to the
assureds, and transmitted by the assureds to the Goshawk Underwriters by means
of bordereaux, in underwriting the CCI policies.

**34.   Proximate Cause and Damages**.  As a proximate cause of the
false statements of Defendant, Plaintiffs have been damaged and will suffer
greater damages in the future, specifically in the form of claims by its assureds
under the CCI policies that the Syndicates would not have issued had they known
that Defendant did not know whether the LE evaluations provided by Defendant
actually adhered to professional standards and met the 85% confidence level.

Syndicate 102 has already paid out over $13 8 million in claims under CCI
policies that Syndicate 102 would not have issued but for reliance on the false
statement of AVS.

### THIRD CLAIM FOR RELIEF
### (Fraud – Actual Intentional Misrepresentation)

**35.    Incorporation By Reference.**  Plaintiffs reallege paragraphs 1
through 22, inclusive, of this Complaint.

**36.    Misrepresentation.**  AVS intentionally (and specifically, with the
intent to deceive) misrepresented to the Goshawk Underwriters, among others,
that its LE evaluations adhered to professional standards and met the 85%
confidence level, and that it had employed the methods and practices appropriate
thereto.

**37.    Knowledge of Falsity.**  At the time it made the misrepresentations,
Defendant knew that they were false.

**38.    Intent.**  Defendant knew that the Goshawk Underwriters would
rely upon its misrepresentations in underwriting the CCI policies, and Defendant

intended that the Goshawk Underwriters underwrite the CCI policies and the

Syndicates issue the policies based upon its misrepresentations.

**39.   Reasonable Reliance by the Goshawk Underwriters and**

**Plaintiffs.** The Goshawk Underwriters and the Syndicates were unaware of the

falsity of the representations by Defendant. The Goshawk Underwriters

reasonably relied upon the misrepresentations of Defendant about the accuracy of

their methodology in making the LEs in underwriting the CCI policies. Had the

Goshawk Underwriters known that AVS LE evaluations did not adhere to

professional standards and did not yield the 85% confidence level, they would not

have underwritten the CCI policies as they did and the Syndicates would not have

issued them

**40.   Proximate Cause and Damages.** As a proximate cause of the

intentional misrepresentations of Defendant, the Syndicates have been damaged

and will suffer greater damages in the future specifically in the form of claims by

their assureds under the CCI policies that the Syndicates would not have issued

had it known that Defendant misrepresented the accuracy of their LEs. The

Syndicates have already paid out over $13.8 million in claims under CCI policies

that the Syndicates would not have issued but for reliance on the false statements of Defendant.

## FOURTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)

**41.    Incorporation by Reference.**  Plaintiffs reallege paragraphs 1 through 22, inclusive, of this Complaint.

**42.    Representations by Defendant.**  Defendant represented to the Goshawk Underwriters, among others, that its LE evaluations adhered to professional standards and incorporated methodologies to yield LEs at the 85% confidence level and that Defendant employed methods and practices necessary and appropriate thereto

**43.    Falsity of Representation.**  The representations made by Defendant were false; its LE evaluations did not adhere to professional standards nor did Defendant utilize methods needed to yield LEs at the 85% confidence level.

**44.    No Reasonable Grounds for Belief in Truth.**  When Defendant made its representations to the Goshawk Underwriters about the 85% confidence

level and professional standards, Defendant had no reasonable ground for believing the representations to be true.

**45.    Intent.** Defendant knew that the Goshawk Underwriters would rely upon representations in underwriting the CCI policies, and Defendant intended that the Goshawk underwriters underwrite the CCI policies based upon the representations of AVS about the 85% confidence level and its professional standards.

**46.    Reasonable Reliance by the Goshawk Underwriters and the Syndicates.** The Goshawk Underwriters were unaware of the falsity of the representations of Defendant.  The Goshawk Underwriters reasonably relied in underwriting the CCI policies upon the false representation of Defendant about its LE evaluations.  Had the Goshawk Underwriters known that the AVS LE evaluations did not incorporate methods needed to yield LEs at the 85% confidence level or adhere to professional standards, they would not have underwritten the CCI policies and the Syndicates would not have issued them.

**47.    Proximate Cause and Damages.** As a proximate cause of the negligent misrepresentation of Defendant, Plaintiffs have been damaged and will suffer greater damages in the future, specifically in the form of claims by its

assureds under the CCI policies that the Syndicates would not have issued had it known that Defendant misrepresented its LE evaluations and adherence to professional standards. Plaintiffs have already paid out over $13.8 million in claims under CCI policies that would not have been issued but for reliance upon the representations of Defendant.

## FIFTH CLAIM FOR RELIEF
### (Negligence)

**48.** **Incorporation by Reference.** Plaintiffs reallege paragraphs 1 through 22, inclusive, of this Complaint.

**49.** **Duty of Defendant.** Defendant had special skill and knowledge not only in connection with LE evaluations, but special knowledge about its own capabilities as well as the expectations of settlement providers and the Goshawk Underwriters. In performing its LE evaluations, Defendant owed the Goshawk Underwriters and the Syndicates a duty to exercise due care to meet the 85% confidence level and to adhere to professional standards.

**50.** **Breach of Duty.** Defendant breached its duties to Plaintiffs by failing to provide LE evaluations that adhered to professional standards and to apply methodologies to yield LEs at the 85% confidence level.

**51.**   **Proximate Cause and Damages.**   As a proximate cause of the breach, Plaintiffs have been damaged in an amount to be determined at the time of trial.  Plaintiffs have already paid out over $13.8 million in claims directly and proximately arising out of the dereliction of duty of Defendant.

WHEREFORE, Plaintiffs pray:

1.   For entry of judgment in favor of Plaintiffs and against Defendant,

2.   For compensatory damages in an amount to be proven at time of trial;

3.   For costs of suit incurred herein;

4.   For any attorneys' fees to which Plaintiffs may be entitled; and

5.   For such other and further relief as this Court deems just and proper.

Dated: _September 8_, 2005

_Jennifer M. Rubin_

John H. Fleming
Ga. Bar No. 263250
Jennifer M. Rubin
Ga. Bar No. 141819
Sutherland Asbill & Brennan
999 Peachtree Street, N.E.
Atlanta, Georgia 30309-3996
Tel.   404.853.8000
Fax    404.853.8806
john.fleming@sablaw.com
jennifer.rubin@sablaw.com

_Counsel for Plaintiffs_

OF COUNSEL:
R. Steven Anderson
Edwin A. Oster
Michael J. Levin
Raenu Barod
Barger & Wolen LLP
10 E. 40th Street
40th Floor
New York, New York  10106
(212) 557-2800